## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AMERICAN HOME       :
ASSURANCE CO.        :
             :
   v.           :   Civil No. CCB-13-1941
             :
             :
KBE BUILDING CORP.      :
             :

### MEMORANDUM

KBE Building Corporation ("KBE") incurred substantial costs in repairing its subcontractors' defective construction of two buildings.  It subsequently sought reimbursement for those expenses from its insurer, American Home Assurance Company ("American Home").  American Home sued, seeking a declaratory judgment that it was not liable under the commercial general liability policies it had sold KBE.  KBE counterclaimed, seeking its own declaratory judgment and alleging breach of the policies, as well as a host of alternative contractual, quasi-contractual, and tort claims.  American Home now moves for summary judgment.  In addition, several individuals subject to subpoenas issued by American Home have moved to quash those subpoenas.  All these motions have been fully briefed and no hearing is necessary to their resolution.  *See* Local Rule 105.5 (D. Md. 2014).[1]  For the reasons explained below, American Home's motion for summary judgment will be granted in part and denied in part, Marshall Taylor's motion to quash will be granted, William Watkins' motion to quash will be denied without prejudice, and KBE's motion to quash or for a protective order will be denied without prejudice.

---

[1] Accordingly, American Home's request for a hearing on its motion for summary judgment, (ECF No. 44), will be denied.

## BACKGROUND

KBE, formerly known as Konover Construction Corporation, is a general contractor. (*See* Countercl. 1, ECF No. 7; Answer Countercl. 1, ECF No. 20.)  In 2006, KBE purchased from American Home, an insurer, a commercial general liability policy to cover the period between June 1, 2006, and June 1, 2007.   (*See* Mot. Summ. J., Ex 3, Galardi Aff. 1, ECF No. 43-4; Opp. Mot. Summ. J., Ex. 25, 2006 Policy, ECF No. 61-26.)  The following year, KBE purchased from American Home another such policy, this one to cover the period between June 1, 2007, and June 1, 2008.  (*See* Galardi Aff. 1; Galardi Aff., Ex 3G, 2007 Policy, ECF No. 43-11.)  Those policies, which were identical in all relevant respects, limited coverage to $1,000,000 per incident, $2,000,000 in the aggregate for "products-completed operations," and an additional $2,000,000 in the aggregate for all other claims.  (*See* 2006 Policy 2; 2007 Policy 2.)  In total, KBE paid over $760,000 for the two policies.  (*See* 2006 Policy 1; 2007 Policy 1.)

During the period of coverage, Waldorf Land L.L.L.P. ("Waldorf Land") hired KBE to construct an "EZ Storage" building in Waldorf, Maryland.  (*See* Countercl. 3; Answer Countercl. 3.)  And Gainesville Land L.L.L.P. ("Gainesville Land") hired the firm to construct another "EZ Storage" building in Prince William County, Virginia.  (*See* Countercl. 5; Answer Countercl. 4.)  KBE completed the Waldorf building in early 2008 and the Gainesville building in mid-2007.  (*See* Countercl. 3, 6; Answer Countercl. 3, 4.)

Dissatisfied with KBE's work, both Waldorf Land and Gainesville Land sued KBE, alleging that the buildings they had purchased did not match the specifications described in the construction contracts.  At both sites, KBE's mason subcontractor failed to properly install grout in the interior cavities of the facilities' masonry block walls, leaving some walls with inadequate

support and other walls with too much.  (*See* Mot. Summ. J., Ex. 1, First Interrog. Answers 4–7,

ECF No. 43-2.)  Those structural deficiencies generated cracks in the exterior walls, lintels, and

piers of the building, as well as the stucco, sealant, and paint applied to those walls.  (*See* First

Interrog. Answers 5, 7; Opp. Mot. Summ. J., Ex. 1, Dunn Aff. ¶ 11, ECF No. 61-2.)  In addition,

subcontractors failed to install adequate insulation in certain temperature-controlled floors of

both buildings and failed to attach appropriately precast horizontal planks to vertical walls in

both facilities.  (*See* First Interrog. Answers 5, 8.)  Additional defects plagued the Gainesville

facility, including failure to grout plank joint connections, application of overly thin surface

paving, and improper wiring of interior lighting fixtures.  (*See* First Interrog. Answers 8–9.)

In May and June 2009, KBE notified American Home that it was claiming coverage

under the policies related to losses associated with both projects.  (*See* Galardi Aff., Ex. 3A,

Waldorf notes 41–42, ECF No. 43-5; Galardi Aff., Ex. 3B, Gainesville notes 30–31, ECF No.

43-6.)  In the ensuing months, KBE representatives repeatedly expressed dissatisfaction with the

perceived slowness of American Home's handling of its claims.  (*See* Opp. Mot. Summ. J., Ex.

1, Dunn. Aff. 2, ECF No. 61-2; Opp. Mot. Summ. J., Ex. 3, Teich Email, Aug. 6, 2009, ECF No.

61-4; Opp Mot. Summ. J., Ex. 5, Anderson Email, Aug. 31, 2009, ECF No. 61-6.)

By at least early October, American Home's claims administrator, Chartis Claims, Inc.,

had assigned claims specialist Lane Goos to handle KBE's Waldorf claim and, by the following

month, the Gainesville claim.  (*See* Mot. Summ. J., Ex 3A, Waldorf Notes 39, ECF No. 43-5;

Mot. Summ. J., Ex 3B, Gainesville Notes, 27, ECF No. 43-6.)  Although Goos had many years

of experience in the insurance industry, he had only begun handling construction defect claims in

spring 2009.  (*See* Opp. Mot. Summ. J., Ex. 7, Goos Dep. 10–13, ECF No. 61-8.)  When

prompted during a deposition, Goos agreed that this period of his career was "pretty overwhelming." (Goos Dep. 133.) Before his assignment to KBE's Waldorf and Gainesville claims, Goos had participated in handling on American Home's behalf a separate set of KBE claims arising out of the firm's construction of two retail stores in Port Covington, Maryland. (*See* Goos Dep. 19–20; First Interrog. Answers 15.) Much like the Waldorf and Gainesville claims, those Port Covington claims involved structural defects caused by improper masonry work. (*See* First Interrog. Answers 15.) Although American Home issued a reservation of rights letter as to the Port Covington claim, it ultimately reimbursed KBE not only for the costs of KBE's defense but also for KBE's expenditures in repairing the defectively constructed buildings. (*See* Dunn Aff. ¶ 7; Goos Dep. 128; Galardi Aff. 3.) American Home reimbursed KBE's repair expenses under the terms of the policies, decreasing the remaining aggregate coverage available to KBE. (*See* Galardi Aff. 3.)

On November 16, 2009, Goos participated in a conference call with Robert Dunn, KBE's General Counsel, and William Watkins, the attorney American Home had retained on KBE's behalf in the litigation pursuant to its duty to defend under the policies. (*See* First Interrog. Answers 16; Opp. Mot. Summ. J., Ex. 2, Watkins Aff. ¶ 2, ECF No. 61-3.) In an interrogatory answer, KBE stated that Goos confirmed during that phone call that American Home had "agreed to undertake KBE's immediate defense in the Waldorf Litigation and Gainesville Litigation, and agreed to the manner in which the Claims would be handled and the construction deficiencies would be remediated and reimbursed to KBE." (First Interrog. Answers 15.)

In a separate affidavit, Watkins recalled that, during that call, he had emphasized the perceived weaknesses of KBE's defenses in both lawsuits and "the high potential for loss of use

damages if the repairs—particularly the structural grouting repairs—were not immediately made to the operating facilities." (Watkins Aff. ¶ 3.)  Accordingly, Watkins recommended staying the lawsuits and immediately beginning repairs to the two buildings.  (*See* Watkins Aff. ¶ 3.)  He believed that participants on the call "agreed that, a) the litigation would be stayed; b) KBE would coordinate the repairs at the facilities because it was most familiar with the projects and could likely do so at substantially less cost than another contractor, including efforts to involve the original subcontractors in the repair efforts." (Watkins Aff. ¶ 3.)  He also remembered that, during the call, Dunn and Goos referred to the Port Covington claims and discussed "how that project was handled and that this case should be handled in a similar fashion." (Watkins Aff. ¶ 3.)  Goos, for his part, stated in a deposition that he could not remember that conference call. (*See* Reply Supp. Mot. Summ. J., Ex. B., Goos Dep. 50, ECF No. 62-2.)  But he specifically denied having reached an agreement with KBE separate from the underlying insurance policies and could not recall ever having asked KBE to repair the two facilities.  (*See* Goos Dep. 72–73, 115–16.)

On the basis of that phone call, KBE began to repair the two facilities.  (*See* Dunn Aff. ¶ 6.)  "Had Mr. Goos not made the commitment to KBE," Dunn stated in an affidavit, "KBE would have considered other alternatives in response to, and defense of, the Claims." (Dunn Aff. ¶ 6.)  Over the next several weeks, Goos communicated with KBE about investigative and repair work performed by subcontractors and engineers.  (*See* Opp. Mot. Summ. J., Exs. 9, 10, ECF Nos. 61-10, 61-11; Dunn Aff. ¶ 8; Waldorf notes 36–37; Gainesville notes 25.)

On January 29, 2010, American Home sent KBE two letters stating that it would be defending KBE in both matters, subject to a reservation of rights.  (*See* Opp. Mot. Summ. J., Ex.

11, ECF 61-12.)  In an affidavit, Dunn stated that issuance of those letters did not indicate that

KBE might not pay for repairs to the Waldorf and Gainesville facilities; after all, American

Home had issued a similar letter with respect to the Port Covington claims, but still reimbursed

KBE for the costs of the repairs it performed in that matter.  (*See* Dunn Aff. ¶ 7.)  American

Home's non-responsiveness to KBE's references to reimbursement may have increased the

firm's sense of security.  In late February, for example, KBE reported to Goos on the progress of

repairs at the Waldorf facility, noting that it planned to submit soon its "first reimbursement

request."  (*See* Opp. Mot. Summ. J., Ex. 13, Dunn Email, Feb. 25, 2010, ECF No. 61-14.)  In late

March, KBE requested reimbursement for $424,399, which included the costs of legal defense,

engineering, and construction at the Waldorf facility.  (*See* Opp. Mot. Summ. J., Ex. 14, Dunn

Email, Mar. 25, 2010, ECF No. 61-15.)  And in early April, KBE twice wrote to Goos'

successor, Michael Bird, emphasizing its alleged agreement with Goos "on a process of handling

[the Waldorf and Gainesville matters] consistent with recent claims on the Port Covington

[stores]."  (Opp. Mot. Summ. J., Ex. 17, Dunn Email, Apr. 13, 2010, ECF No. 61-18; *see also*

Opp. Mot. Summ. J., Ex. 16, Dunn Email, Apr. 6, 2010, ECF No. 61-17.)[2]

On April 20, KBE requested an update on the status of the reimbursement request it had

submitted the previous month, emphasizing its "agreement with Lane Goos to proceed with

repairs and reimbursements as we had done with similar issues at the Port Covinginton project."

(*See* Opp. Mot. Summ. J., Ex. 20, Dunn Email, Apr. 20, 2010, ECF No. 61-21.)  Bird responded

that American Home's treatment of the Port Covington claims "is not an agreement that is made

to each and every claim," such that "all repairs and decisions made for repair are being done so

---

[2] Goos left Chartis at roughly the same time and Michael Bird, a casualty adjuster, became KBE's primary contact with American Home.  (*See* Goos Dep. 8; Waldorf notes 35; Gainesville notes 22.)

[sic] under [KBE's] own power and are in no way subject to an agreement that was made on the [Port Covington matters]." (Opp. Mot. Summ. J., Ex. 20, Bird Email, Apr. 20, 2010, ECF No. 61-21.) In late May, American Home issued a second set of reservation-of-rights letters concerning the Waldorf and Gainesville facilities, this time describing American Home's position in greater detail. (*See* Galardi Aff., Exs. 3E, 3F, ECF Nos. 43-9, 43-10.) To date, American Home has not reimbursed KBE for repairs it completed on the Waldorf and Gainesville buildings. (*See* Dunn Aff. ¶ 10.) Although KBE has requested payment of $2,858,383.22, American Home has only reimbursed that firm for $34,762.21 in defense costs. (*See* Dunn Aff. ¶ 10.)

American Home sued KBE in Maryland court, seeking a declaratory judgment that it was not liable for the costs of KBE's repairs under the terms of the policies. (Compl. 6–7, ECF No. 2.) KBE subsequently removed the case to this court, (*see* ECF No. 1), and filed a counterclaim, (*see* Countercl., ECF No. 7). In that counterclaim, KBE also sought a declaratory judgment that American Home owed it a duty to reimburse its repair costs under the policy and alleged that KBE breached its contractual duty. In addition, KBE alleged American Home had breached a separate agreement, entered into by Goos, to reimburse KBE for the costs of repair, that principles of promissory estoppel or quantum meruit required reimbursement, that American Home breached the common law duty of good faith and fair dealings, and that American Home's treatment of its obligations under the policies was negligent.

## ANALYSIS

### I. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

## II. Claim Premised on the Policies

American Home seeks summary judgment on its request for a declaratory judgment concerning its liability under the insurance policies it issued to KBE, arguing that those policies do not cover KBE's claims. The parties agree that Connecticut law governs interpretation of the policies. (*See* Mem. Supp. Mot. Summ. J. 11, ECF No. 43-1; Mem. Opp. Mot. Summ. J. 27, ECF No. 61.) Those policies provide, in relevant part, that American Home would indemnify KBE for "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' . . . ." (2006 Policy, Commercial General Liability Coverage Form

1; 2007 Policy 9.)  The policies define "property damage," in turn, as either "[p]hysical injury to tangible property, including all resulting loss of use of the property," or "[l]oss of use of tangible property that is not physically injured."  (2006 Policy, Commercial General Liability Coverage Form 13; 2007 Policy 21.)  According to American Home, the repairs KBE completed merely corrected KBE's own deficient performance, rather than remedying "property damage," as that term is defined in the policies.[3]

In *Capstone Building Corp. v. American Motorists Insurance Co.*, 67 A.3d 961 (Conn. 2013), the Connecticut Supreme Court interpreted the scope of "property damage" under a materially identical commercial general liability insurance policy issued to a general contractor pursuing claims arising in part from its subcontractors' defective work on a construction project. Although *Capstone* cautioned that evaluating the viability of such claims "is a highly fact-dependent determination," 67 A.3d at 978, it outlined the parameters of that inquiry.  Where an insured contractor seeks indemnity "based on physical injury to or loss of use of *nondefective* property"—such as mold or other moisture-related damage arising from defective construction— its claims are covered.  *Id.* at 979 (emphasis added).  By contrast, where such a contractor's claims are premised on "project components defective prior to delivery, or those defectively installed," its claims are *not* covered unless defective work "result[s] in damage to other,

---

[3] KBE suggests that the court need not interpret the policies at all, advancing a pair of related arguments premised on American Home's conduct *before* issuance of its initial reservation-of-rights letters.  First, KBE asserts that American Home's months-long delay in issuing those letters amounted to a waiver of its right to invoke the policy language on which it now relies.  But waiver does not permit reformation of an insurance contract, meaning that "a party cannot create through waiver coverage for a claim that the parties expressly had excluded from that contract."  *Heyman Assocs. No. 1 v. Ins. Co. of State of Pa.*, 653 A.2d 122, 134 (Conn. 1995) (citing 16B J. & J. Appleman, *Insurance Law and Practice* § 9090 (1981)).  Second, KBE argues that American Home is estopped from denying coverage insofar as it "caused the insured to rely on nonexistent coverage."  (Reply Mot. Summ. J. 27, ECF No. 61 (quoting 7 *Couch on Insurance* § 101:9 (2013)).  But KBE cites no Connecticut authority supporting that proposition, and independent research has netted none.  To the contrary, Connecticut courts, like those of most states, have generally preferred not to extend an insurance policy's coverage via estoppel.  *See Capstone Building Corp. v. American Motorists Insurance Co.*, 67 A.3d 961, 998 (Conn. 2013).  Although some jurisdictions have adopted the exception KBE seeks, KBE offers no indication that Connecticut has done so.

nondefective property." *Id.* at 980. In reaching this conclusion, *Capstone* relied on *Traveler's Insurance Co. v. Eljer Manufacturing, Inc.*, 757 N.E.2d 481, 502 (Ill. 2010), which held that "'physical injury' unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension." *Capstone* thus concluded that "the commercial general liability policy covers claims for property damage caused by defective work, but not claims or repairs of the defective work itself." *Id.* at 982.

American Home contends that KBE seeks indemnification for the costs it incurred in repairing its own defective work, which does not qualify as "property damage" under *Capstone*. KBE, for its part, emphasizes that its subcontractors' defective grouting of both buildings damaged other components of the structure—namely, cracking in the walls, lintels, and piers, as well as damage to the finishings applied to those walls. (*See* First Interrog. Answers 5, 7; Dunn Aff. ¶ 11.)[4] There is no evidence that those walls, lintels, piers, or finishings were damaged when KBE tendered the buildings to their owners; the only evidence in the record, contained in a terse interrogatory answer, indicates that they were damaged because of deficient grouting. (*See* First Interrog. Answers 5, 7.) Drawing all inferences in KBE's favor, as Rule 56 requires, a jury could conclude that KBE's subcontractors' defective work caused that cracking, which was thus covered by American Home's policies.

American Home, however, argues that the buildings' cracked walls cannot be analytically distinguished from the grout that was supposed to fill them. On this account, "[t]he defective work was not the grout; it was the walls of which the grout was a component part." (Reply Mot.

---

[4] KBE refers to no other damage to the buildings caused by its defective construction. Although KBE points to the extensive renovations of both buildings, which it undertook to ensure their structural integrity, "repairs to structural deficiencies, made for the purpose of preventing '[p]hysical injury to tangible property . . .' before the alleged deficiency has caused 'property damage' are not within the insuring agreement's definition of property damage." *Capstone*, 67 A.3d at 981 n.23.

Summ. J. 6, ECF No. 62.)  For support, American Home invokes *Amerisure Mutual Insurance Co. v. Auchter Co.*, 673 F.3d 1294, 1296–97, 1307 (11th Cir. 2012), in which the Eleventh Circuit held that, under Florida law, a contractor was not covered under a commercial general liability policy for the defective construction of a roof from which concrete tiles had begun to come loose, dislodging from the roof before hitting and cracking other roofing tiles.  Among its many arguments, the insured asserted that those lost or damaged tiles qualified as "property damage" within the meaning of the policy.  *See id.* at 1299–1300.  The Eleventh Circuit disagreed.  "Because the [building's] roof was an amalgamation of scores of interlocking roofing tiles and other roofing materials," the court reasoned, "the roofing tiles themselves are not the relevant components in this case.  They are simply some of the raw materials from which this particular roof was made."  *Id.* at 1308.  That conclusion flowed, in part, from practical considerations: the parties acknowledged that the defective installation of the tiles could be remedied only by entirely reconstructing the roof.  *Id.*

This case is meaningfully different.  In the first place, none of the parties assert that the cracked walls and damaged finishings could not be repaired independently of the grouting.  Even were it otherwise, this contract dispute arises under the law of Connecticut, not of Florida, which governed *Amerisure*.  Although *Capstone* "agree[d] with the Florida Supreme Court" in concluding that the commercial general liability policy extended only to "damage beyond the faulty workmanship or defective work," 67 A.3d at 981 (quoting *United States Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 889 (Fl. 2007)), it also indicated that cracked walls caused by defective work were covered by a materially identical commercial general liability policy even if the structural defects that caused that cracking were not.  In particular, *Capstone* cited *Fidelity &*

*Deposit Co. of Maryland v. Hartford Casualty & Insurance Co.*, 215 F. Supp. 2d 1171, 1183–84 (D. Kan. 2002), as a "good example" of the principle that prophylactic repairs to prevent *future* property damage are not covered by the policy.  *Capstone*, 67 A.3d at 981 n.23.  In *Fidelity & Deposit Co.*, as in this case, a mason subcontractor's shoddy work resulted in cracked walls. *Fid. & Dep. Co.*, 215 F. Supp. 2d at 1178, 1183.  And there, as here, inadequate interior support in the masonry walls made those walls "susceptible to cracking in the future."  *Id.* at 1183.  As *Capstone* explained, the already cracked walls "were unquestionably 'property damage' under the commercial general liability policy," while the inadequate interior support for other walls "had not yet caused physical injury to other property, although it would likely have damaged property in the future."  *Capstone*, 67 A.3d at 981 n.28.  In other words, a cracked wall was covered, even if its deficiently constructed interior was not.  *Capstone*'s reliance on *Fidelity & Deposit Co.*, then, suggests that the Connecticut Supreme Court would reject American Home's argument that a cracked wall cannot be analytically distinguished from its internal supports.

American Home next asserts that KBE "has never attempted to segregate its costs between repairs for defective work and non-defective work."  (*See* Reply Mot. Summ. J. 5, ECF No. 62.)  That observation is accurate but irrelevant, at least at this stage in the proceedings.  To avoid summary judgment, a party need only establish genuine issues of material fact as to the existence of liability, not identify a precise damages figure.

If a jury ultimately determines that the cracked walls and their finishings are covered by the policies, then it would follow that any loss of use of the property, including any "[l]oss of use of tangible property that is not physically injured," caused by that cracking is also covered. (2006 Policy, Commercial General Liability Coverage Form 13; 2007 Policy 21.)  KBE indicates

that its settlement with the facilities' owners included compensation for their loss of use of the property.  (*See* First Interrog. Answers 11.)  Although KBE has not yet segregated what proportion of those loss of use damages are attributable to the cracked walls and their finishings, that inquiry can await a later stage of the proceedings.

For the reasons described above, the court will deny summary judgment as to American Home's liability under the insurance policies it issued to KBE to the extent KBE seeks indemnity for repairs to cracked walls, lintels, and piers, as well as the finishings applied to those surfaces and any loss of use damages attributable to such cracking.  To the extent KBE seeks indemnity for other repairs or loss of use damages attributable to them, summary judgment will be granted, consistent with the principles in *Capstone*.  The precise breakdown between covered and non-covered costs of repair will be determined at a later stage of the proceedings.

## III. Counterclaims

American Home next seeks summary judgment on KBE's counterclaims premised on American Home's conduct after it had received notice of KBE's claims.  KBE alleges that it formed a valid contract with American Home, separate from the insurance contracts, to pay KBE's claims.  Failing that, KBE alleges that principles of promissory estoppel, quantum meruit, the common law covenant of good faith and fair dealing, or negligence entitle it to compensation.

### A. Breach of Contract

KBE alleges that American Home breached a separate agreement to reimburse KBE for the repairs it completed.  American Home seeks summary judgment on that claim, arguing lack of evidence that it agreed with KBE to reimburse that firm on any basis separate from the

policies.  Although the parties dispute whether this claim is governed by the law of Connecticut or of Iowa, they each acknowledge that the disagreement is immaterial insofar as both states subscribe to the same pertinent principles of contract law.  (*See* Mem. Supp. Mot. Summ. J. 13; Mem. Opp. Mot. Summ. J. 32.)  Indeed, the court's analysis would be the same under either state's law, eliminating the need to conduct a choice of law analysis.  *See Perini/Tompkins Joint Venture v. ACE Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013).  In Connecticut and Iowa, as both parties concede, a valid contract requires a "meeting of the minds."  *See, e.g.*, *Peak v. Adams*, 799 N.W.2d 535, 544 (Iowa 2011); *Fortier v. Newington Grp., Inc.*, 620 A.2d 1321, 1323–24 (Conn. App. Ct. 1993).  Such a meeting of the minds refers to the parties' mutual assent to definite terms and requirements.  *See, e.g.*, *Bender v. Bender*, 975 A.2d 636, 656 (Conn. 2009); *Schaer v. Webster Cnty.*, 644 N.W.2d 327, 338 (Iowa 2002).

There is insufficient evidence of any such meeting of the minds here.  KBE insists that the agreement between American Home and KBE was confirmed during the conference call on November 16 between Dunn, Goos, and Watkins.  Yet none of the three participants on that call have testified to the terms of a definite agreement.  In a deposition, Goos indicated that he could not recall the conversation at all and expressly denied entering an agreement with KBE separate from the underlying policies.  (*See* Goos Dep. 50, 72–73, 115–16.)  In Dunn's affidavit, he refers to a "commitment" Goos had apparently made on November 16, but not to the terms or specific requirements of that commitment.  (*See* Dunn Aff. ¶ 6.)  He later states that Goos "authorized" KBE to proceed with hiring certain firms to complete that work, but "did not respond" as to others.  (*Id.* at ¶ 8.)  Watkins, in his affidavit, indicated that the parties had "agreed" to stay the litigation and that "KBE would coordinate the repairs" to the facilities.  (Watkins Aff. ¶ 3.)  As

to reimbursement, however, he stated only that the Dunn and Goos engaged in a "discussion"—not that they had reached an *agreement*—"that this case *should* be handled in a" manner similar to the Port Covington claims.  (*Id.* (emphasis added).)  The word "should" is hortatory, not imperative.  *See, e.g.*, *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014).  And a statement of intent to agree in the future does not form a contract.  *See, e.g.*, *Stewart v. Cendant Mobility Servs. Corp.*, 837 A.2d 736, 742–43 (Conn. 2003); *Scott v. Grinnell Mut. Reinsurance Co.*, 653 N.W.2d 556, 562 (Iowa 2002).

KBE implies that American Home's silence in the face of KBE's repeated reference to reimbursement and to the process the parties employed to resolve the Port Covington claims is probative of the existence of an agreement.  (*See* Dunn Email, Mar. 25, 2010; Dunn Email, Apr. 6, 2010; Dunn Email, Apr. 13, 2010.)  But silence rarely constitutes acceptance.  *See, e.g.*, *Rucker v. Taylor*, 828 N.W.2d 595, 602 (Iowa 2013); *Shulman v. Hartford Pub. Library*, 177 A. 269, 271 (Conn. 1935).  Even were it otherwise, American Home ultimately paid the Port Covington claims pursuant to its general liability policy, (*See* Galardi Aff. 3), so KBE's recurrent mention of the process by which those claims were handled suggests no agreement separate from the policies it purchased.  Still less does American Home's silence imply its acquiescence to any such separate agreement.

While KBE's assumption that American Home would pay the cost of repairs may be understandable, there is simply not sufficient evidence proffered to prove the existence of a contract outside the terms of the policy.[5]  For these reasons, summary judgment on count III of KBE's counterclaim, for breach of contract, will be granted for American Home.

---

[5] The court notes that Watkins and Dunn appear never to have been deposed.  Presumably, they advanced the most accurate version of events they could recall in their affidavits, yet they fail to show a definite and unequivocal promise by American Home to reimburse KBE for repairs regardless of the terms of the insurance policies.

**B. Promissory Estoppel**

American Home next seeks summary judgment on KBE's alternative claim of liability

under the doctrine of promissory estoppel.  Again, the parties dispute whether KBE's promissory

estoppel claim is governed by the law of Connecticut or of Iowa.  And, again, both parties

acknowledge that those jurisdictions endorse the same pertinent legal principles and the result is

identical under the law of both.  (*See* Mem. Supp. Mot. Summ. J. 17–18; Mem. Opp. Mot.

Summ. J. 34.)  Under the doctrine of promissory estoppel in Connecticut, as in Iowa, "[a]

promise which the promisor should reasonably expect to induce action or forbearance on the part

of the promise . . . and which does induce such action or forbearance is binding if injustice can

be avoided only by enforcement of the promise."  *Stewart*, 837 A.2d at 742 (alteration in

original) (quoting 1 Restatement (Second) of Contracts § 90 (1981)); *Nat'l Bank of Waterloo v.

Moeller*, 434 N.W.2d 887, 889 (Iowa 1989).

As noted, KBE offers insufficient evidence of a clear and definite promise that American

Home would reimburse KBE for the repairs irrespective of its obligations under the policies.

Accordingly, summary judgment on count IV of KBE's counterclaim, premised on promissory

estoppel, will be granted for American Home.

**C. Quantum Meruit**

American Home also seeks summary judgment on KBE's claim for restitution, under the

doctrine of quantum meruit, for the benefits it allegedly conferred on American Home.  The

parties dispute whether the law of Connecticut, Maryland, or Virginia governs this claim, (Mem.

Supp. Mot. Summ. J. 20; Mem. Opp. Mot. Summ. J. 43), but summary judgment would be

proper under the law of any of those three jurisdictions.

In each jurisdiction, quantum meruit refers to restitution for the value of benefits bestowed on one party by another.  *See, e.g.*, *Dolan v. McQuaide*, 79 A.3d 394, 402 (Md. Ct. Spec. App. 2013) (explaining that "*quantum meruit* is not truly a cause of action but a *measure of recovery* available in an action for contract implied-in-fact or for unjust enrichment"); *Walpole Woodworkers, Inc. v. Manning*, 57 A.3d 730, 733 n.9 (Conn. 2012) ("Quantum meruit is an equitable remedy to provide restitution for the reasonable value of services despite an unenforceable contract."); *Mongold v. Woods*, 677 S.E.2d 288, 292 (Va. 2009) ("Quantum meruit recovery . . . is based upon an implied contract to pay the reasonable value of services rendered.").  Although the term may describe either a remedy for a contract implied-in-fact by the parties conduct or to redress unjust enrichment, KBE has never specified the character of its claim.[6]  The oversight is irrelevant, however, because KBE has not demonstrated that it bestowed a benefit on American Home.

KBE first contends that it undertook "a minimally disruptive repair process" at the EZ Storage facilities, "thereby allowing tenants to continue using storage units with minimal interruption" and saving American Home from "exposure to significant loss of use claims" under the insurance policies.  (Opp. 43.)  At the time KBE performed those repairs, American Home's potential liability, if any, for the loss of use of the facilities would have arisen only under the insurance policies.  As to such potential loss of use damages, then, American Home received no benefit greater than its liability under the policies.  And KBE's remedy to recoup any such benefit lies exclusively in a breach of contract action.  As this court noted in a previous memorandum, (ECF No. 32), quantum meruit does not apply where an express contract governs

---

[6] In Connecticut, although "[q]uantum meruit . . . does not depend upon the existence of a contract, either express or implied in fact," *Gagne v. Vaccaro*, 766 A.2d 416, 423 (Conn. 2001), it "is *usually* a remedy based on implied contract," *United Coastal Indus., Inc. v. Clearheart Constr. Co.*, 802 A.2d 901, 906 (Conn. Ct. App. 2002) (emphasis added).

the subject matter of the dispute.  *See, e.g.*, *300 State, LLC v. Hanafin*, 59 A.3d 287, 291 (Conn.

App. Ct. 2013) (noting that "a party 'cannot be held liable simultaneously for breach of an

express contract and an implied in law contract governing the same subject matter'" (citation

omitted)); *Mongold*, 677 S.E.2d at 292 (noting that a court will not imply a contract between

parties where there is an enforceable express contract covering the same subject matter); *Ver

Brycke v. Ver Brycke*, 843 A.2d 758, 772 n.9 (Md. 2004) (noting that "the general rule is that no

quasi-contractual claim can arise when a contract exists between the parties concerning the same

subject matter on which the quasi-contractual claim rests" (internal quotation marks and citation

omitted)).

KBE next argues that its decision to stay litigation and undertake repairs of the two

facilities saved American Home "significant defense costs," including "expert witness fees."

(Opp. 44.)  KBE made that choice with the advice of counsel, who warned "of the difficulties

and anticipated expense in defending the claims based on the facts [he] had received," as well as

the scope of potential liability.  (Watkins Aff. ¶ 3.)  KBE offers no legal authority for the

proposition that its choice to forego costly, risky litigation constituted a "benefit" to its liability

insurer.  Equitable considerations do not compel KBE's conclusion, which risks inducing

unnecessary litigation in future insurance disputes.

For these reasons, then, summary judgment will be granted for American Home on count

V of KBE's counterclaim, for quantum meruit.

### D. Breach of the Covenant of Good Faith and Fair Dealings

American Home next moves for summary judgment on KBE's claim that it breached the

implied covenant of good faith and fair dealings in its policies.  The parties dispute whether this

claim is governed by the law of Connecticut, Virginia, or Maryland.  (Mem. Supp. Mot. Summ.

J. 23–24; Mem. Opp. Mot. Summ. J. 4–5.)  The court need not resolve that dispute, however,

because it fails under each state's law.  As noted in a previous memorandum, (ECF No. 32),

neither Virginia nor Maryland courts recognize a cause of action for breach of the covenant of

good faith and fair dealing separate from breach of the underlying contract.  *See A&E Supply Co.*

*v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 677 (4th Cir. 1986) (Virginia law); *Swedish Civil*

*Aviation Admin. v. Project Mgmt. Enters., Inc.*, 190 F. Supp. 2d 785, 793–94 (D. Md. 2002)

(Maryland law).  And, for the reasons explained below, summary judgment is proper even if the

claim is governed by Connecticut law.

Under Connecticut law, the duty of good faith and fair dealings creates an implied duty in

every contract, "requiring that neither party do anything that will injure the right of the other to

receive the benefits of the agreement."  *Renaissance Mgmt. Co. v. Conn. Housing Fin. Auth.*, 915

A.2d 290, 297–98 (Conn. 2007) (quoting *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*,

849 A.2d 382, 388 (Conn. 2004)).  The bad faith denial of benefits under an insurance contract

breaches that implied covenant.  *Capstone*, 67 A.3d at 986 & n.33.  "Bad faith in general implies

both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or

refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as

to one's rights or duties, but by some interested or sinister motive . . . . Bad faith means more

than mere negligence; it involves a dishonest purpose."  *Id.* at 986 (omission in original) (quoting

*De La Concha*, 849 A.2d at 388).

KBE's offers no evidence of any such "interested or sinister motive" here.  It indicates

that American Home's delayed issuance of a reservation of rights letter, failure to provide any

other notice that it would dispute the claim, and "inadequate and unreasonably protracted investigation," constituted sufficient evidence of bad faith to avoid summary judgment.  (Opp. 47–48.)  For support, KBE invokes a federal case predicting that the Connecticut Supreme Court "would recognize a common law action for property insurer procedural bad faith, that is, claims handling misconduct not involving wrongful withholding of payment due under an insurance policy . . . ."  *United Techs. Corp. v. Am. Home Assur. Co.*, 118 F. Supp. 2d 181, 186 (D. Conn. 2000).  *Capstone* contradicted that prediction, holding that "[a] bad faith cause of action not tied to duties under the insurance policy must . . . fail as a matter of law."  67 A.3d at 988.  But where, as here, an insurer arguably fails to indemnify covered losses, *see supra* Part II, "an insurer's 'failure to conduct an adequate investigation of a claim . . . *when accompanied by other evidence*, reflecting an improper motive, properly *may* be considered as evidence of . . . bad faith."  *Capstone*, 67 A.3d at 990 (first emphasis added) (quoting *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 838 A.2d 135, 305 (Conn. 2004)).

In this sense, *United Technologies* remains probative of the sort of evidence that might indicate that an insurer denied a contractual benefit on the basis of a bad faith investigation.  That case denied a motion for judgment as a matter of law on such a procedural bad faith claim where the insured's evidence demonstrated that the insurer "did nothing itself and required nothing of its attorneys, . . . imposed no schedule or deadlines on its counsel, required no coverage opinion letter, authorized no retention of experts, instituted no adjustment process, set minimal reserves, and . . . *manifested an early intention to deny claims* . . ."  *Id.* at 184 (emphasis added).  Here, by contrast, nothing indicates that American Home had taken a definitive position on coverage prior to conducting an investigation.  To the contrary, it set aside a reserve to cover the possibility of

indemnifying KBE, as per its usual procedures.  (*See* Gainesville notes 27; Goos Dep. 46–48,

105.)  It advised the counsel it appointed to defend KBE on potentially appropriate engineering

experts.  (*See* Waldorf notes 36; Goos Dep. 76.)  And, although American Home's issuance of its

initial reservation of rights letters was arguably delayed, it issued at least two sets of such letters,

including a second more detailed pair of letters explaining its coverage position in greater detail

than the first pair.  The absence of any other evidence of bad faith is conclusive.  American

Home's arguably clumsy handling of KBE's claim is inadequate to sustain KBE's bad faith

claim in the absence of any evidence of improper motive.

Summary judgment will thus be granted for American Home on count VI of KBE's

counterclaim, for breach of the covenant of good faith and fair dealing.

### E. Negligence

KBE also seeks to hold American Home liable for negligently handling its claims.

American Home, however, seeks summary judgment on the ground that KBE offers no evidence

that American Home owed KBE a duty distinct from its contractual obligations.  For the purpose

of this motion, both parties agree that Connecticut law governs the claim, although KBE has

reserved the right to challenge that consensus in future proceedings.  (Mem. Supp. Mot. Summ.

J. 31; Mem. Opp. Mot. Summ. J. 4–5.)

Under Connecticut law, "an independent claim of tortious conduct may arise in the

context of a contractual relationship."  *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly,*

*P.C.*, 87 A.3d 534, 540 (Conn. 2014) (collecting cases).  In such a circumstance, "mere breach of

the contract would not afford a basis for a recovery in tort, but the necessary elements to

establish negligence must be shown."  *Montinieri v. S. New England Tel. Co.*, 398 A.2d 1180,

1182 (Conn. 1978) (quoting *Dean v. Hershowitz*, 177 A. 262, 266 (1935)).  In this sense, the

negligence and contract claims must be independent of one another, *see, e.g.*, *Bonan v. Goldring*

*Home Inspections, Inc.*, 794 A.2d 997, 1004 n.7 (Conn. App. Ct. 2002), such that they are

premised on the breach of distinct duties, *see, e.g.*, *Gazo v. Stamford*, 765 A.2d 505, 515 (Conn.

2001) ("An action in contract is for the breach of a duty arising out of a contract; an action in tort

is for a breach of duty imposed by law.").

KBE grounds its negligence claim entirely in the contractual theories already discussed.

"[T]o the extent American Home breached its contractual, quasi-contractual, and implied duties

of good faith and fair dealing under the policy," KBE argues, "it also negligently failed to fulfill

its obligations."  (Opp. Mot. Summ. J. 49.)  To save that negligence claim, it denies that

Connecticut law requires it to prove breach of a duty distinct from the contract, invoking *Hoyt v.*

*Factory Mutual Liability Insurance Company of America*, 179 A. 842 (Conn. 1935).  *Hoyt*,

however, offers KBE no support.  To the extent *Hoyt* discusses negligence at all, it expressly

reserved the question whether a liability insurer's failure to settle an ultimately meritorious claim

within the policy limits was governed by the "requirement of good faith and honest judgment" or

the standard of "care and diligence which a person of ordinary prudence would exercise in the

management of his own business."  *Id.* at 843.  Because the insurer was liable under either

standard, *Hoyt* declined "to decide whether one test or the other should be adopted in this

jurisdiction as determinative of the obligations of an insurer in such a case."  *Id.*  KBE points to

no Connecticut case interpreting *Hoyt* as endorsing a negligence standard, let alone to one

applying such a negligence standard outside the context of a liability insurer's refusal to settle its

insured's lawsuit.  Even assuming such a negligence standard applies, KBE itself offers no

22

principled basis to extend that rule beyond the context of settlement.

For these reasons, summary judgment on count VII of KBE's counterclaim, for negligence, will be granted for American Home.

## IV. Motions to Quash

Three separate motions to quash subpoenas issued by American Home are also pending before the court. Generally, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). Federal Rule of Civil Procedure 45 authorizes parties to issue subpoenas to nonparties in possession of relevant information, seeking production of "designated documents, electronically stored information, or tangible things in that person's possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(A)(iii); *see also* Fed. R. Civ. P. 34(c); *Lynn v. Monarch Recovery Mgmt., Inc.*, 285 F.R.D. 350, 361 (D. Md. 2012). In certain enumerated circumstances, however, a court must quash or modify a subpoena upon a timely motion. *See* Fed. R. Civ. P. 45(d)(3)(A). Under Local Rule 104.7, the court will not consider such a motion unless the moving party has attempted to resolve the dispute cooperatively and filed a certification describing those efforts.

### A. William Watkins' Motion to Quash

William Watkins moves to quash a subpoena directing Watkins to appear at a deposition and produce documents related to his representation of KBE in the Gainesville and Waldorf matters. As he concedes, Watkins filed no certification that he had attempted to resolve the dispute informally with American Home before filing his motion. (*See* Reply Supp. Mot. Quash 1, ECF No. 53.) By way of explanation, Watkins' counsel indicate that they were appointed on the day the motion was filed, with the understanding "that informal discussions [about the

23

subpoena] occurred through intermediaries, but that the motion needed to be timely filed when

no resolution was reached." (Reply Supp. Mot. Quash 1.) That statement is supported neither by

documentation nor by affidavit. And American Home denies that it participated in any such

discussion. To the contrary, it indicates that, had such a conference occurred, American Home

"would have discussed the scope of the subpoena, considered granting more time to Mr. Watkins

and Sands Anderson to respond, and discussed a reasonable cost-shifting arrangement." (Opp.

Mot. Quash 4, ECF No. 41.) That representation suggests that "this entire dispute could, and

should, have been avoided had counsel cooperated in the conduct of discovery, as they are

obligated to do." *Kemp v. Harris*, 263 F.R.D. 293, 297 (D. Md. 2009). For failure to confer,

then, Watkins' motion to quash will be denied without prejudice. Although the period for

discovery is now closed, Watkins will have an additional thirty days after issuance of this

memorandum and accompanying order to comply with the subpoena or make further objections

to it. In light of the court's ruling on American Home's motion for summary judgment,

however, the subpoena may now be moot.

### B. KBE's Motion to Quash

KBE moves to quash six subpoenas or, alternatively, for a protective order. Five of those

subpoenas are directed at KBE's attorneys; the sixth, at its insurance broker, People's United

Insurance Agency. KBE objects to those subpoenas on the grounds that they are unduly

burdensome and that they seek the production of documents protected by the attorney-client

privilege and the work product doctrine. *See* Fed. R. Civ. P. 45(d)(3)(A)(iii)–(iv).

"Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is

not a party to the action unless the party claims some personal right or privilege with regard to

the documents sought." 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2459 (3d ed. 1998), *cited in In re Grand Jury Subpoena John Doe, No. 05GJ1318*, 584 F.3d 175, 184 n.14 (4th Cir. 2007). KBE thus has standing to object to the subpoenas on the basis of the attorney-client privilege. It also has standing to object on the basis of the work product doctrine. *See, e.g.*, *In re Grand Jury Subpoena*, 745 F.3d 681, 693 (3d Cir. 2014) ("[T]o the extent a client's interests may be affected, he . . . may assert the work product privilege" (quoting *In re Grand Jury Proceedings*, 604 F.2d 798, 801 (3d Cir. 1979).). KBE lacks standing, however, to object on the ground of undue burden. *See, e. g.*, *CineTel Films, Inc. v. Does 1-1, 052*, 853 F. Supp. 2d 545, 556 (D. Md. 2012) ("[T]he undue burden contemplated by Rule 45 is one placed on the direct recipient of the subpoena . . . not on third parties . . . .").

The party claiming the protection of the attorney-client privilege or the work product doctrine bears the burden of proof as to its application. *See, e.g.*, *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 232 (4th Cir. 2011). The party asserting such protection must carry this burden "with particularity for each document, or category of documents, for which privilege/protection is claimed," *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 267 (D. Md. 2008), by "describe[ing] the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim," Fed. R. Civ. P. 45(e)(2)(A)(ii). Guideline 10(d)(ii)(b) of the Local Rules provides additional information that a party objecting to the production of a particular document under an analogous provision of the federal rules, *see* Fed. R. Civ. P. 26(b)(5)(A)(ii), should include in its particularized description of the allegedly protected documents. "This description generally takes the form of a privilege log." *Mezu v. Morgan*

25

*State Univ.*, 269 F.R.D. 565, 577 (D. Md. 2010) (quoting *Cencast Servs. v. United States*, 91 Fed. Cl. 496, 502 (2010)).  Failure to provide such a log, or equivalent information, may forfeit the claimed privilege.  *Id.*

Here, KBE has not produced a privilege log or any other particularized description of the allegedly protected documents it seeks to shield from discovery.  Its motion to quash or modify the subpoenas will thus be denied without prejudice.  KBE's claims of privilege and of the protection of the work product doctrine, however, are not forfeit.  KBE does not physically possess the documents American Home seeks, which are under the control of its attorneys and People's United.  Under such circumstances, forfeiture is too harsh a remedy.  *See Weber v. Paduano*, No. 02-CIV-3392 (GEL), 2003 WL 161340, at *12 (S.D.N.Y. Jan. 22, 2003) (refusing to hold forfeited a claimed privilege where no privilege log was produced because the allegedly protected documents were not in the possession of the party asserting it).

Alternatively, KBE moves for a protective order forbidding the production of allegedly privileged documents.  *See* Fed. R. Civ. P. 26(c)(1)(D).  Because it has not demonstrated adequately that the documents it seeks to protect are privileged, its motion for a protective order will also be denied without prejudice.

The parties subject to the challenged subpoenas will have thirty days after issuance of this memorandum and accompanying order to comply with those subpoenas or object to them.  In that time, KBE may make whatever arrangements are necessary to produce the privilege log or other documentation necessary to support properly its objections.  As noted, however, American Home's subpoenas may now be moot in light of the court's ruling on American Home's motion for summary judgment.

**C. Marshall Taylor's Motion to Quash**

Marshall Taylor moves to quash a subpoena directing him to appear at a deposition and to produce documents associated with his prior legal representation of KBE.  In response to that subpoena, Taylor spoke with American Home's counsel and wrote counsel a letter, stating that he had withdrawn from the law firm of which he was previously a partner and transferred all his files concerning KBE to other attorneys.  (*See* Mot. Quash, Ex. 1, ECF No. 36.)  Having not received a response either to that letter or to a subsequent communication, Taylor filed this motion.  American Home does not oppose that motion, which will be granted.

**CONCLUSION**

For the reasons stated above, American Home's motion for summary judgment will be granted in part and denied in part, leaving only the parties' claims for declaratory relief and KBE's claim for breach of the policies insofar as those claims relate to American Home's failure to indemnify KBE for repairing the cracked walls, lintels, piers, and finishings applied to them and any loss of use damages attributable to that cracking.  Watkins' and KBE's motions to quash will both be denied without prejudice.  And Taylor's motion to quash will be granted.

A separate order follows.


January 13, 2015
Date

_____/s/_____
Catherine C. Blake
United States District Judge